UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DANIEL BRIEHL
On his own behalf

    and

GARY CROSS
On his own behalf

    Plaintiffs,

    v.                                                             Civil No.  1:22-cv-00158

THE ISLAMIC REPUBLIC OF IRAN

    and

THE IRANIAN MINISTRY OF INFORMATION
AND SECURITY

    Defendants.

## COMPLAINT

  DANIEL BRIEHL, *et al.,* (Plaintiffs), file this lawsuit pursuant to the District of Columbia Wrongful Death Act, the District of Columbia Survival Act, and the Foreign Sovereign Immunities Act (28 U.S.C. § 1602 et seq.), as amended, 28 U.S.C. § 1605A or its predecessor law, 28 U.S.C. § 1605(a)(7), to the extent it continues to apply to this case and related statutes. The lawsuit is brought to recover Plaintiffs' damages suffered as a result of the Iranian sponsored terrorist attack upon the United States Embassy in Nairobi, Kenya on August 7, 1998.

## JURISDICTION AND VENUE

(1)  This Court exercises subject matter jurisdiction in accordance with the provisions of 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1605A.

(2)  The Plaintiffs in this action are U.S. nationals who were "employee[s] of the Government of the United States…" or were "individual[s] performing a contract awarded by the United States Government, acting within the scope of the employee's employment…" at the time of the bombings, or their immediate family members.

(3)  The Court exercises *in personam* jurisdiction over the parties designated as Defendants in accordance with the provisions of 28 U.S.C. § 1605A.

(4)  While acting within the scope of their employment or office, agents, employees, and officials of the Islamic Republic of Iran ("Iran") provided the technical know-how and tactical training that allowed al Qaeda to build the bombs that destroyed the U.S. Embassy at Nairobi, Kenya. This qualifies as material support as it is defined under 28 U.S.C. § 1605A. Subject matter jurisdiction is properly asserted under 28 U.S.C. § 1605A. The Foreign Sovereign Immunities Act provides that there "shall" be personal jurisdiction over a foreign state whenever there is subject matter jurisdiction over a claim for relief plus effective service of process. 28 U.S.C. § 1330(b).

(5)  Venue in this Court is proper in accordance with the provisions of 28 U.S.C. § 1391(f)(4), which provides in pertinent part that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

(6)  The causes of action contained in the five counts later enumerated in this Complaint are based upon 28 U.S.C. § 1605A(c), which is available to both US national and non-US national Plaintiffs, and wherever the common or statutory law of a Plaintiff's residence contains rights or

2

makes further damages available that are not duplicative of the recovery afforded under 28 U.S.C. § 1605A(c), as Plaintiffs have causes of action under the common or statutory law of the US state or foreign country where they were domiciled at the time of the attack.

## THE PARTIES

### PLAINTIFFS

(7)     Plaintiffs GARY CROSS and DANIEL BRIEHL are citizens of the United States who were injured as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiffs were present at the Embassy in their capacity as members of the U.S. Marine Corps. Plaintiffs now bring this action in their own right for their personal injuries, emotional distress, and loss of society.

### DEFENDANTS

(8)     Defendant, the ISLAMIC REPUBLIC OF IRAN, (hereinafter referred to as "Iran") is a foreign state within the meaning of 28 U.S.C. § 1391(f) and § 1603(a).

(9)     IRAN was at the time of the act hereinafter complained of, and is to the present, designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A, the Export Administration Act of 1979 (50 U.S.C. Appendix, § 2405(j)), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371.

(10)    IRAN has been found to be liable as a state sponsor of international terrorism under 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605A, especially in connection with acts perpetrated by its state sponsored paramilitary terrorist organization, known as "Hezbollah", in various cases before this court, including *Anderson v. the Islamic Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000), and *Owens v. Republic of Sudan, et al.,* 826 F. Supp. 2d 128 (D.D.C. 2011).

(11)    IRAN, through its officials, officers, agents and employees including the IRANIAN MINISTRY OF INFORMATION AND SECURITY (MOIS), provided material support and resources to Osama bin Laden and al Qaeda both directly and through its surrogate, Hezbollah. The support provided by IRAN to Osama bin Laden and al Qaeda assisted in and contributed to the preparation and execution of the plans that culminated in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, and the deaths and injuries caused by the bombing.

(12)    Defendant MOIS is an agency of the Defendant, the ISLAMIC REPUBLIC OF IRAN, whose activities included, at all times relevant to this action, the prosecution of terrorist acts directed against the armed forces of the United States and United States citizens, by and through material support to various terrorist organizations including the terrorist organization known as Hezbollah.

## FACTS

(13)    Hezbollah is an organization of Lebanese Muslims who are adherents of the Shia or Shiite faction of Islam. It represents itself as "an Islamic freedom fighting movement" which views any part of the Near East under the control of the State of Israel as "occupied land". It advocates the expulsion of the United States from the Near East and is committed to violent action to that end and to the termination of the existence of the State of Israel. At all times relevant to this action, Hezbollah was given extensive support by the Defendants which permitted it to carry out a wide ranging program of terrorism against the United States. At the time of the act giving rise to this action, Hezbollah was under the complete operational control of those Defendants, through Iranian Revolutionary Guard units.

(14) Al Qaeda is an organization of Muslim extremists which has been designated as a terrorist group by the U.S. Department of State. It operates worldwide with the avowed purpose of bringing about the destruction of the United States by violent means.

(15) The Ministry of the Interior of the Republic of Sudan is an agency of the Republic of Sudan. Its activities at the time of this occurrence included the support of terrorist activities directed against foreign targets by terrorist groups operating with cover of the Republic of the Sudan.

(16) The Republic of Sudan, acting through the Ministry of the Interior of the Republic of the Sudan, entered into an arrangement with al Qaeda and Hezbollah under which those organizations received shelter and protection from interference while carrying out planning and training of various persons for terrorist attacks, including the attacks of August 7, 1998. These included an organizational and planning meeting within the Republic of Sudan of Osama bin Laden, chief of al Qaeda, and Imad Mughaniyah, chief of Hezbollah's terrorist activities, with the purpose of planning and carrying out the attacks upon the embassies of the United States in Dar es Salaam, Tanzania and Nairobi, Kenya, which occurred on August 7, 1998.

(17) More specifically, Plaintiffs allege:

    a) In the early 1990s, the government of Sudan sent overtures to bin Laden and al Qaeda, inviting the group to relocate en masse from Afghanistan to the Sudan. Jamal Ahmed Al-Fadl, a top al Qaeda lieutenant who served Bin Laden in Afghanistan as well as the Sudan, learned of the impending relationship between al Qaeda and the Sudanese government for the first time at one of the meetings in Peshawar, Pakistan, that occurred between the Sudanese government, bin Laden, and other al Qaeda members. The representatives of the Sudanese government

5

      promised the support of that government should al Qaeda come to the Sudan. Al Qaeda thereafter used Sudanese Airways planes to ferry anti-tank rockets and Stinger missiles from Afghanistan to the Sudan.

b)     The government of the Sudan is run by President Field Marshall Omar Hassan al-Bashir, the head of state of the Sudan, through an alliance of the military and the National Congress Party, formerly the National Islamic Front.

c)     Al Fadl went to the Sudan to secure residential and commercial property for al Qaeda. The purpose of some of the property was to provide a safe place to train al Qaeda militants.

d)     Essam al Riddi, a pilot who worked for bin Laden in 1993, stated that he purchased a plane for bin Laden, oversaw its refurbishment, and flew it to Khartoum in 1993.

e)     While al Riddi stayed in Khartoum, he dined with bin Laden and had several discussions with him. Bin Laden was staying in a large villa in Khartoum, with an office and a guesthouse. The Sudanese government provided security for al Qaeda. Roughly 15 – 20 Sudanese men dressed in Sudanese army fatigues, using jeeps with Sudanese army license plates, were stationed at the villa.

f)     Al Qaeda provided al Riddi with a plane from Sudanese Airlines to ferry militants to Nairobi. Bin Laden discussed the possibility of al Riddi transporting some Stinger missiles from Pakistan to the Sudan.

g)     Bin Laden assured him that the Sudanese and Pakistani intelligence agencies would cooperate with the weapons transfer.

h)  The training that al Qaeda received in the Sudan included explosives training. The loud noises drew the local police after complaints from neighbors. Al Fadl was among those arrested. He was quickly released due to the close relationship between al Qaeda and the Sudanese intelligence service, a Defendant in this action. According to al Fadl:

[W]e call the intelligence office because we have relationship with them, and the intelligence office came and they tell the local police we take care of that, and don't worry about that. And they take us to the jail, and they say you shouldn't do that, we tell you to refresh[1], not to make real explosives.

i)  Al Fadl saw a letter from President al Bashir that explained the relationship between al Qaeda and Sudanese intelligence. With the explicit approval of bin Laden, al Fadl also personally worked with the Sudanese intelligence officers.

j)  The Sudanese intelligence officers and government officials, at all times, acted within the scope of their office or agency during the activities described in this Complaint.

k)  The intelligence officers were organized into a "delegation office" to meet the needs of the al Qaeda group in the Sudan. There was an explicit fear that agents from foreign governments or informants would disclose al Qaeda's location and activities in the Sudan. Some of these informants were consequently jailed in the Sudan. Al Fadl would identify suspicious foreigners to the Sudanese intelligence as al Qaeda sought to keep its presence and activities in the Sudan secret.

---

[1] "refresh" meant refresher courses for the militants who had already received training in the past.

l)   The delegation office, staffed with Sudanese intelligence officers, also helped provide security for al Qaeda and facilitated the movement of weapons in and out of the country. On one particular trip, the weapons were taken out of the country by delivering four crates of weapons to a hangar at a Sudanese military base, and then to a port facility owned by the Sudanese army.

m)   The letter from President al Bashir was absolutely essential to the operations of the al Qaeda terrorist group, which was secretly training in the Sudan. The letter allowed al Qaeda members, such as al Fadl, to bypass tax and customs collection on international shipments and guaranteed that their shipments, coming or going, would not be inspected.

n)   Weapons and explosive shipments moved through a quay protected by the Sudanese military in Port Sudan into a barracks used by a Sudanese armored and mechanized infantry. The letter would allow shipments from overseas to bypass inspection at a port and then travel back to Khartoum without inspection by the local police at the numerous checkpoints along the way.

o)   The delegation office, the Sudanese government's go-between with al Qaeda, also protected al Qaeda members, such as al Fadl, from the interference of Sudanese immigrations office at the airport. This was important because if al Qaeda members were caught abroad and their passports were stamped with Sudanese immigration markings, it would be clear to foreign agents where the organization was located.

p)   Al Qaeda also set up a number of companies that provided it with critical income so that it could continue its growth and evolution into a lethal organization with

global reach. However, al Qaeda did not come to Sudan to operate as a regular capitalist enterprise. Rather, the purpose of the investment in Sudanese business activity was as adjunct to its mission of aggression against the West, as explicitly stated by bin Laden himself:

…[O]ur agenda is bigger than business. We not going to make business here, but we need to help the government and the government help our group, and this our purpose.

q) Among the Sudanese companies founded by al Qaeda were: Laden International Company for import and export; Taba Investment for currency exchange; Hijra Construction Company, which built the largest road existing in Sudan; and the al Themar al Mubaraka, which ran the farm where al Qaeda trained its militants in explosives. The Hijra Construction Company purchased explosives for its road and bridge building activities.

r) Al Qaeda also had extensive holdings in Khartoum, including business offices, guesthouses, farms, and residential houses. Bin Laden even had a bank account in Khartoum in his true name. Al Qaeda purchased some of the companies directly from the Sudanese government. The funding that these companies provided to al Qaeda was critical to its survival and continued existence. At a meeting, which included bin Laden, the fluctuation of Sudanese currency caused great concern as most of al Qaeda's income was derived from this business activity.

s) Al Qaeda's position regarding the United States was clear, as early as 1992, when bin Laden issued a fatwa against the United States due to its presence in the Gulf region during Operation Desert Shield and its actions in Somalia. The discussion

|   |   |
|---|---|
|   | surrounding the fatwa included an explicit allowance for the murder of innocent civilians. Al Qaeda provided support to groups in Somalia, Yemen, the Philippines, Tajikistan, and Pakistan, among others. |
| t) | The partnership forged with the Sudanese government derived benefits for both parties, as do all successful partnerships. The Sudanese government employed al Qaeda to manufacture chemical weapons in a section of Khartoum called Hilat Koko, for use against the rebels in southern Sudan. Al Fadl traveled to the chemical weapons manufacturing area with a Sudanese military officer, who explained the need for chemical weapons by the Sudanese government. |
| u) | Al Qaeda also provided communications equipment and Kalishnikov rifles for the Sudanese army, founded by the National Islamic Front, to fight the Christian rebels in the south. Al Fadl, as part of this arrangement, also worked directly for the Sudanese government. For example, a Sudanese intelligence officer who also worked in the immigration office approached al Fadl and asked him to spy on a government opposition leader. Al Fadl arrested the opposition leader and tried to turn him away from his work against the Sudanese government. The Sudanese intelligence officer advised al Fadl to lie to the opposition leader, to tell him that al Fadl had quit al Qaeda and had stopped working with the government. Al Fadl reported back to the head of the delegation office, the group of Sudanese intelligence officers that protected al Qaeda, facilitated communications with the Sudanese government, and provided logistical support. |
| v) | Dr. Abdullah Mohammed Yusef, a member of the Islamic National Front, through which President al Bashir ran the Sudanese government, organized travel |

       documents and funneled economic aid to al Qaeda while it was located in the Sudan.

w)     Al Qaeda entered into a transaction to purchase uranium through the former President of the Sudan, currently an officer in the Sudanese army. The quality of the uranium was tested in Hilat Koko, the section of Khartoum where the government was partnered with al Qaeda in the manufacture of chemical weapons. Al Fadl discussed the uranium test with a member of the Sudanese government, whose brother "runs" the building where the chemical weapon manufacture was housed.

x)     Without the material support, assistance, and aid provided by Sudanese government officials acting within the scope of their agency, employment, or office, al Qaeda could not have carried out the United States embassy bombings that caused plaintiffs' injuries. Such material support, assistance, and aid fits within the definition of material support as described by 18 U.S.C. § 2339A.

y)     The Defendants not only knew that al Qaeda was attempting to conceal itself in the Sudan, but facilitated and furthered al Qaeda's concealment through the activities of the Sudanese intelligence services. The scale of support that Defendants provided to al Qaeda was substantial. The regime invited al Qaeda to roost in the Sudan and knew, at least from 1992 onward, of al Qaeda's anti-U.S. crusade.

z)     The then and current regime of Sudan explicitly allied itself with al Qaeda for an illegal and unlawful purpose. The regime conspired with al Qaeda in the manufacture of weapons and training of terrorists, all the while knowing of al

Qaeda's anti-U.S. crusade. The provision of support to a terrorist organization is illegal and unlawful. The explicit purpose of their agreement was to make each stronger. The U.S. Embassy bombings greatly enhanced al Qaeda's worldwide reputation and attracted money, recruits, and support from those allied against the United States.

(18) Acting upon its knowledge of the attacks about to be carried out by those with whom it had conspired, IRAN withdrew its diplomatic personnel from both Dar es Salaam and Nairobi on August 6, 1998. The next day the attack was carried out against the American embassies in both locations. At Dar es Salaam, the American embassy was attacked through detonation of materials being transported by truck including TNT, acetelyne cylinder tanks, bags of nitrate fertilizer, and a detonator. At Nairobi, the American Embassy was attacked through detonation of materials being transported by truck including a gas enhanced explosive device. The MOIS, the Iranian agents of Defendant IRAN in operational control of Hezbollah operated with high level technical expertise in the use of explosives which would not have been available to the al Qaeda operatives in the absence of Iranian participation. The Ministry of the Interior of the Republic of the Sudan provided cover and protection for the organization and training of the persons carrying out the attack as well as venues for these activities.

(19) The actions of the agents and co-conspirators of the Defendants, and those who were substantially aided and abetted by Defendants, as set forth above, inflicted mental distress upon the families of the plaintiffs, who suffered physical injuries, extrajudicial killings, and assault and battery under state common law. The material support rendered to co-conspirators of the Defendants, and those who were substantially aided and abetted by Defendants, fits within the definition of material support as described by 18 U.S.C. § 2339A.

(20)     The formation of Hezbollah and its emergence as a major terrorist organization was the product of direct intervention by Iranian operatives, including the Iranian Revolutionary Guards and the Defendant, the Iranian Ministry of Information. Hezbollah's support of al Qaeda made this attack possible; all of the above referred to activities of Hezbollah were financed, technologically supported and commanded by Iranian military/intelligence operatives.

## COUNT I
## CLAIM OF GARY CROSS FOR PERSONAL INJURY
## RESULTING FROM ASSUALT AND BATTERY,
## AND PAIN AND SUFFERING DUE TO PERSONAL INJURIES
## (28 U.S.C. § 1605A and MAINE COMMON LAW)

(21)     Plaintiff, Gary Cross, a resident of the State of Maine at the time of the occurrence alleged, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(22)     On August 7, 1998, when the explosive device above was detonated at Nairobi, Kenya, Gary Cross suffered severe and permanent injuries, including severe lacerations which have resulted in scarring and permanent and severe post-traumatic stress disorder. The explosion was intended to cause harmful contact with plaintiff and put him in reasonable apprehension of imminent battery. These injuries were caused by a willful and deliberate act of persons who had been materially assisted by Defendants for the purpose of inflicting physical injuries upon this Plaintiff and others and by doing so to intimidate the United States, and to cause its withdrawal from the Near East and Africa. Those persons were at all times acting with the material support of the Defendants and with the concurrence of Defendants, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.

(23)    As a direct and proximate consequence of the intentional acts of the agents of the Defendants as above set forth and the injuries thereby inflicted, Plaintiff Gary Cross has been required to undergo extensive medical treatment, nursing care, and other treatment, for which he has been required to expend funds and has endured great pain and suffering, and thereby suffered damages in the amount of ten million dollars.

**WHEREFORE**, Plaintiff Gary Cross demands judgment against the Defendants the Islamic Republic of Iran and the Iranian Ministry of Information and Security, in the amount of TEN MILLION DOLLARS ($10,000,000.00), besides costs.

### COUNT II
### CLAIM OF GARY CROSS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (28 U.S.C. § 1605A and MAINE COMMON LAW)

(24)    Plaintiffs Gary Cross repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(25)    As a direct and intended consequence of the intentional and reckless actions of the Defendants, conduct that is intolerable in a civilized society, the Islamic Republic of Iran and the Iranian Ministry of Information and Security, their co-conspirators and those who were substantially aided and abetted by Defendants who carried out the attacks above alleged, the Plaintiff whose name is set forth in the preceding paragraph, was caused severe mental distress which will continue for the balance of Plaintiff's life, and has thereby suffered damages in the amount of twenty million dollars.

**WHEREFORE,** Plaintiffs Gary Cross demands judgment, jointly and severally, against the Defendants the Islamic Republic of Iran and the Iranian Ministry of Information and Security, in the amount of TWENTY MILLION DOLLARS ($20,000,000.00), besides costs.

## COUNT III
## CLAIM OF DANIEL BRIEHL FOR PERSONAL INJURY
## RESULTING FROM ASSUALT AND BATTERY,
## AND PAIN AND SUFFERING DUE TO PERSONAL INJURIES
## (28 U.S.C. § 1605A and NORTH CAROLINA COMMON LAW)

(26)    Plaintiff Daniel Briehl, a resident of the State of North Carolina at the time of the occurrence alleged, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(27)    On August 7, 1998, when the explosive device above was detonated at Nairobi, Kenya, Daniel Briehl suffered severe and permanent injuries, including severe lacerations which have resulted in scarring and permanent and severe post-traumatic stress disorder. The explosion was intended to cause harmful contact with plaintiff and put him in reasonable apprehension of imminent battery. These injuries were caused by a willful and deliberate act of persons who had been materially assisted by Defendants for the purpose of inflicting physical injuries upon this Plaintiff and others and by doing so to intimidate the United States, and to cause its withdrawal from the Near East and Africa. Those persons were at all times acting with the material support of the Defendants and with the concurrence of Defendants, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.

(28)    As a direct and proximate consequence of the intentional acts of the agents of the Defendants as above set forth and the injuries thereby inflicted, Plaintiff Daniel Briehl has been required to undergo extensive medical treatment, nursing care, and other treatment, for which he has been required to expend funds and has endured great pain and suffering, and thereby suffered damages in the amount of ten million dollars.

**WHEREFORE**, Plaintiff Daniel Briehl demands judgment against Defendants the Islamic Republic of Iran and the Iranian Ministry of Information and Security, in the amount of TEN MILLION DOLLARS ($10,000,000.00), besides costs.

## COUNT IV
## CLAIM OF DANIEL BRIEHL
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (28 U.S.C. § 1605A and NORTH CAROLINA COMMON LAW)

(29)    Plaintiff Daniel Briehl repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(30)    As a direct and intended consequence of the intentional and reckless actions of the Defendants, conduct that is intolerable in a civilized society, the Islamic Republic of Iran and the Iranian Ministry of Information and Security, their co-conspirators and those who were substantially aided and abetted by Defendants who carried out the attacks above alleged, the Plaintiff whose name is set forth in the preceding paragraph, was caused severe mental distress which will continue for the balance of Plaintiff's life, and has thereby suffered damages in the amount of twenty million dollars.

**WHEREFORE,** Plaintiff Daniel Briehl demands judgment, jointly and severally, against the Defendants the Islamic Republic of Iran and the Iranian Ministry of Information and Security, in the amount of TWENTY MILLION DOLLARS ($20,000,000.00), besides costs.

## COUNT V
## PUNITIVE DAMAGES
## (28 U.S.C. § 1605A)

(31)    Plaintiffs Gary Cross, *et al*., repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

16

(32)     The actions described more fully above were carried out with the material support, knowledge, and assistance of the Defendants, the Islamic Republic of Iran and the Iranian Ministry of Information and Security. The actions were malicious, willful, unlawful, and in wanton disregard of life and the standards of law which govern the actions of civilized nations.

(33)     The personal injuries, loss of life and resulting damages, as described above, were intended as a result by each Defendant. The actions of those who carried out the attack described were within the scope of their agency on behalf of Defendants.

(34)     In accordance with the provisions of 28 U.S.C. § 1605A(c) each Plaintiff is thereby entitled to economic damages, solatium, pain and suffering, and punitive damages.

(35)     Defendants are vicariously liable for the actions of those agents, officials and employees who supported and carried out the attack within the scope of their office as described above.

**WHEREFORE,** Plaintiffs Gary Cross and Daniel Briehl pray that judgment be entered, jointly and severally, against the Islamic Republic of Iran and the Iranian Ministry of Information and Security, in the amount of SIXTY MILLION DOLLARS ($60,000,000.00), besides costs, upon collection the amount in punitive damages to be distributed to each Plaintiff in the proportion that compensatory damages awarded to that Plaintiff bears to the total compensatory damages award pursuant to this Complaint.

### ADDITIONAL PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that the Court grant Plaintiffs' request for judgment against Defendants on Counts I – V and, in addition to the requested damages already set forth herein, award Plaintiffs prejudgment interest as allowed by law.

January 24, 2022                                              Respectfully submitted,

                                                                   **FAY LAW GROUP, PA**

*/s/ Amanda Fox Perry*
Amanda Fox Perry (Bar No. 230024)
6205 Executive Boulevard
Rockville, MD 20852
(202) 589-1300
Amanda.Perry@faylawgroup.com


*/s/ Caragh Fay*
Caragh Fay (Bar No. 16955)
6205 Executive Boulevard
Rockville, MD 20852
(202) 589-1300
CaraghFay@gmail.com

*Attorneys for Plaintiffs*